# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

Case No. 24-40637

FEDERATION OF AMERICANS FOR CONSUMER CHOICE, INCORPORATED;
JAMES HOLLOWAY; JAMES JOHNSON; TEXAS TITAN GROUP;
PROVISION BROKERAGE, L.L.C.; V. ERIC COUCH,

*Plaintiffs-Appellees,*

*v.*

UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, SECRETARY,
U.S. DEPARTMENT OF LABOR, IN HER OFFICIAL CAPACITY,

*Defendants-Appellants.*

Consolidated with Case No. 24-10890

AMERICAN COUNCIL OF LIFE INSURERS; NATIONAL ASSOCIATION OF INSURANCE
AND FINANCIAL ADVISORS – FORT WORTH; NATIONAL ASSOCIATION OF INSURANCE
AND FINANCIAL ADVISORS – DALLAS; NATIONAL ASSOCIATION OF INSURANCE AND
FINANCIAL ADVISORS – PINEYWOODS OF EAST TEXAS; NATIONAL ASSOCIATION OF
INSURANCE AND FINANCIAL ADVISORS – TEXAS; NATIONAL ASSOCIATION OF
INSURANCE AND FINANCIAL ADVISORS; NATIONAL ASSOCIATION FOR FIXED
ANNUITIES; INSURED RETIREMENT INSTITUTE; FINSECA,

*Plaintiffs-Appellees,*

FINANCIAL SERVICES INSTITUTE; SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION,

*Intervenor Plaintiffs-Appellees,*

*v.*

UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, IN HER OFFICIAL
CAPACITY AS SECRETARY, UNITED STATES DEPARTMENT OF LABOR,

*Defendants-Appellants.*

On Appeal from the United States District Courts for the Eastern District of Texas,
No. 6:24-cv-00163-JDK, and Northern District of Texas, No. 4:24-cv-00482-O

**BRIEF OF PLAINTIFFS-APPELLEES IN CASE NO. 24-10890**

COUNSEL LISTED ON INSIDE COVER

ANDRES C. SALINAS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

MICHAEL A. YANOF
NICOLAIDES FINK THORPE
  MICHAELIDES SULLIVAN LLP
2911 Turtle Creek Blvd., Suite 1025
Dallas, TX 75219
(469) 290-9047

DAVID W. OGDEN
KELLY P. DUNBAR
KEVIN M. LAMB
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 663-6000
Kelly.Dunbar@wilmerhale.com

*Counsel for Plaintiffs-Appellees in No. 24-10890*

November 13, 2025

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that members of this Court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellees | Counsel |
| --- | --- |
| American Council of Life Insurers<br><br>National Association of Insurance and Financial Advisors – Fort Worth<br><br>National Association of Insurance and Financial Advisors – Dallas<br><br>National Association of Insurance and Financial Advisors – Pineywoods of East Texas<br><br>National Association of Insurance and Financial Advisors – Texas<br><br>National Association of Insurance and Financial Advisors<br><br>National Association for Fixed Annuities<br><br>Insured Retirement Institute<br><br>Finseca<br><br>*(Plaintiffs-Appellees in No. 24-10890)* | David W. Ogden<br>Kelly P. Dunbar<br>Kevin M. Lamb<br>Andres C. Salinas<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br><br>Michael A. Yanof<br>NICOLAIDES FINK THORPE MICHAELIDES SULLIVAN LLP |
| Federation of Americans for Consumer Choice, Incorporated<br><br>James Holloway<br><br>James Johnson | Parker Douglas Young<br>Don Colleluori<br>Amber Dawn Reece<br>FIGARI + DAVENPORT, LLP |

| Texas Titan Group<br>Provision Brokerage, L.L.C.<br>V. Eric Couch<br>*(Plaintiffs-Appellees in No. 24-40637)* | |

| **Intervenor Plaintiffs-Appellees** | **Counsel** |
|---|---|
| Financial Services Institute<br>Securities Industry and Financial Markets<br>*(Intervenor Plaintiffs-Appellees in No. 24-10890)* | Eugene Scalia<br>Jason J. Mendro<br>Andrew G.I. Kilberg<br>Lochlan F. Shelfer<br>Russell H. Falconer<br>GIBSON, DUNN & CRUTCHER LLP<br><br>Charles W. Fillmore<br>H. Dustin Fillmore, III<br>THE FILLMORE LAW FIRM |

| **Defendants-Appellants** | **Counsel** |
|---|---|
| United States Department of Labor<br>Lori Chavez-DeRemer (in her official capacity as Secretary, Department of Labor) | Seema Nanda<br>Wayne R. Berry<br>Megan Hansen<br>Alyssa C. George<br>DEPARTMENT OF LABOR<br>OFFICE OF THE SOLICITOR<br><br>Brian M. Boynton<br>Damien Diggs<br>Leigha Simonton<br>Michael S. Raab<br>Michael Shih<br>Steven H. Hazel<br>DEPARTMENT OF JUSTICE<br>CIVIL DIVISION, APPELLATE SECTION |

|  | Julie Straus Harris<br>Galen N. Thorp<br>Alexander N. Ely<br>Garrett Mannchen<br>DEPARTMENT OF JUSTICE<br>CIVIL DIVISION, FEDERAL PROGRAMS<br>BRANCH |
|---|---|

| **Amici Curiae** | **Counsel** |
|---|---|
| American Association of Retired Persons | William Alvarado Rivera<br>AARP FOUNDATION LITIGATION |
| Public Investors Advocate Bar Association | Jason W. Burge<br>FISHMAN HAYGOOD, L.L.P. |

| **Amici Curiae in the District Court** | **Counsel** |
|---|---|
| Hispanic Leadership Fund | Kent A. Mason<br>DAVIS & HARMAN LLP |
| Chamber of Commerce of the United States | Kendyl T. Hanks<br>Amanda Ann Williams<br>GREENBERG TRAURIG, LLP<br><br>Jaime Santos<br>William M. Jay<br>Jesse Lempel<br>GOODWIN PROCTER LLP<br><br>Kevin Palmer<br>Maria C. Monaghan<br>US CHAMBER LITIGATION CENTER |

| Certified Financial Planner Board of Standards, Inc. | Williams L. Sessons<br>SESSIONS & ASSOCIATES PLLC<br><br>Erin Koeppel<br>Leo G. Rydzewski<br>CFP BOARD |
|---|---|

/s/ Kelly P. Dunbar
KELLY P. DUNBAR

*Counsel of Record for Plaintiffs-Appellees in No. 24-10890*

**STATEMENT REGARDING ORAL ARGUMENT**

For purposes of a stay under 5 U.S.C. § 705, the district court correctly concluded that the Department of Labor's "Retirement Security Rule: Definition of Investment Advice Fiduciary," 89 Fed. Reg. 32,122 (Apr. 25, 2024), and related Prohibited Transaction Exemption Amendments are likely unlawful under a straightforward application of *Chamber of Commerce v. Department of Labor*, 885 F.3d 360 (5th Cir. 2018). The Department of Labor has not contested that Appellees would suffer irreparable injury absent preliminary relief. For those reasons, Appellees submit that this interlocutory appeal might be decided without oral argument. Appellees, of course, stand ready to participate in oral argument if this Court believes it would be helpful to its assessment of the issues raised.

**TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS ................................................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................................v

TABLE OF AUTHORITIES ........................................................................ viii

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...................................................................5

STATEMENT OF ISSUE PRESENTED.............................................................5

STATEMENT OF THE CASE...........................................................................6

     A.     The Importance Of Insurance Products To Retirement Savers .........................................................................................6

     B.     The Marketing And Distribution Of Annuities....................................8

     C.     State And SEC Regulation Of Annuities .............................................10

     D.     ERISA Fiduciary Obligations ..............................................................14

     E.     The Department's Vacated 2016 Fiduciary Rule..............................17

     F.     The Department's 2024 Attempt To Repackage The 2016 Rule.......................................................................................................19

     G.     Proceedings Below ..............................................................................21

SUMMARY OF ARGUMENT........................................................................23

STANDARD OF REVIEW .............................................................................25

ARGUMENT ..............................................................................................26

I.    THE RULE IS CONTRARY TO LAW ......................................................26

     A.     The Rule Exceeds DOL's Statutory Authority ...................................26

1. The Rule unlawfully dispenses with the common law's distinction between sales speech and fiduciary investment advice ......................................28

2. The Rule unlawfully departs from ERISA's common-law standard by eliminating the longstanding "regular basis" and "primary basis" requirements...............................................39

3. The Rule unlawfully departs from the common law by eliminating the "mutual agreement" requirement .................................................44

4. The Rule fails the major questions doctrine ...........................46

5. Constitutional avoidance underscores the Rule's illegality ................................................48

B. The Rule Conflicts With *Chamber* In Other Ways.............................50

1. The Rule overrides the statutory distinction between Titles I and II of ERISA .............................................50

2. The Rule usurps authority that the Dodd-Frank Act delegated to the SEC or reserved to the States .........................52

3. The Rule's written acknowledgment requirement authorizes private enforcement that Congress did not.................................................................53

II. THE REMAINING STAY FACTORS WARRANT RELIEF.......................................55

III. PROPER RELIEF IS NOT PARTY-LIMITED..........................................57

CONCLUSION .................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**CASES**

Page(s)

*Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210 (5th Cir. 2023) ..................................................................................................25

*American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Society of United States*, 841 F.2d 658 (5th Cir. 1988) ...............................................................................31, 42

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017 (4th Cir. 1997) ...........................................................................................46

*Braidwood Management, Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024) ..................................................................................................58

*Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011) ..................49

*Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000)...................................14

*Career Colleges & Schools of Texas v. Department of Education*, 98 F.4th 220 (5th Cir. 2024) .............................................................25, 57, 58

*Chamber of Commerce v. DOL*, 885 F.3d 360 (5th Cir. 2018) ........................*passim*

*Children's Broadcasting Corporation v. Walt Disney Company*, 245 F.3d 1008 (8th Cir. 2001) ........................................................................44

*Clarke v. CFTC*, 74 F.4th 627 (5th Cir. 2023) .......................................................55

*Consolidated Beef Industries, Inc. v. New York Life Insurance Company*, 949 F.2d 960 (8th Cir. 1991).........................................................32

*Corner Post, Inc. v. Board of Governors of Federal Reserve Systems*, 603 U.S. 799 (2024)...........................................................................58

*Cotton v. Massachusetts Mutual Life Insurance Company*, 402 F.3d 1267 (11th Cir. 2005) ........................................................................31

*Crawford Painting & Drywall Company v. J.W. Bateson Company*, 857 F.2d 981 (5th Cir. 1988) .........................................................................34

*Edenfield v. Fane*, 507 U.S. 761 (1993) ......................................................49

*Erie Insurance Company v. Hickman ex rel. Smith*, 622 N.E.2d 515
(Ind. 1993) .............................................................................30

*Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017)............................49

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ...................................48

*Feds for Medical Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023)........................57

*Hult v. Home Life Insurance Company of New York*, 240 N.W. 218
(Iowa 1932)...........................................................................31

*In re Mid-Island Hospital, Inc.*, 276 F.3d 123 (2d Cir. 2002)...............................46

*Jacked Up, L.L.C. v. Sara Lee Corporation*, 854 F.3d 797 (5th Cir.
2017) .....................................................................................44

*Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*,
2017 WL 11103938 (S.D. Fla. June 26, 2017).................................44

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) .................25, 42, 43

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022)..........................................47, 55

*Mertens v. Hewitt Associates*, 508 U.S. 248 (1993) ..........................................36

*Mexican Gulf Fishing Company v. Department of Commerce*,
60 F.4th 956 (5th Cir. 2023) ...................................................50

*National Institute of Family & Life Advocates v. Becerra*,
585 U.S. 755 (2018)................................................................49

*NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773 (1979)........................................35

*Pitts v. Jackson National Life Insurance Company*, 574 S.E.2d 502
(S.C. Ct. App. 2002) ........................................................13, 30

*Restaurant Law Center v. DOL*, 66 F.4th 593 (5th Cir. 2023)..............................55

*Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP*,
420 P.3d 223 (Colo. 2018).......................................................44

*Schloegel v. Boswell*, 994 F.2d 266 (5th Cir. 1993) .................................................42

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ...................................................14

*Slamon v. Carrizo (Marcellus) LLC*, 654 F. Supp. 3d 405 (M.D. Pa. 2023) ...............................................................................................................45

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................................49

*Stockett v. Penn Mutual Life Insurance Company*, 106 A.2d 741 (R.I. 1954) .................................................................................................................31

*Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) ................................................56

*United Scenic Artists, Local 829, Brotherhood of Painters & Allied Trades, AFL-CIO v. NLRB*, 762 F.2d 1027 (D.C. Cir. 1985) ........................35

*Van Loon v. Department of Treasury*, 122 F.4th 549 (5th Cir. 2024) .....................25

*West Virginia v. EPA*, 597 U.S. 697 (2022) .............................................................47

## STATUTORY PROVISIONS

5 U.S.C.
    § 705 .....................................................................................1, 3, 25, 58
    § 706 ......................................................................................................25

15 U.S.C. § 80b-2...........................................................................................................9

26 U.S.C. § 4975 ..............................................................................................15, 16, 26

28 U.S.C.
    § 1291 .......................................................................................................5
    § 1292 .......................................................................................................5

29 U.S.C.
    § 1002 ....................................................................................16, 26, 27, 32
    § 1104 ......................................................................................................14
    § 1106 ......................................................................................................15
    § 1109 ......................................................................................................15
    § 1132 ......................................................................................................15

Pub L. No. 111-203, 124 Stat. 1376 (2010)...............................................................11

Pub. L. No. 116-94, 133 Stat. 3137 (2019)..................................................................8

Pub. L. No. 117-328, 136 Stat. 5275 (2022)................................................................8

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

17 C.F.R. § 240.15*l*-1..............................................................................11, 12

40 Fed. Reg. 50,842 (Oct. 31, 1975) (codified at 29 C.F.R. § 2510.3-31) ...........16, 39

42 Fed. Reg. 32,395 (June 24, 1977) ...............................................................17

49 Fed. Reg. 13,208 (Apr. 3, 1984) .................................................................17

81 Fed. Reg. 20,946 (Apr. 8, 2016) ..................................................17, 18, 38, 46

84 Fed. Reg. 33,318 (July 12, 2019)..............................................................12, 13

89 Fed Reg. 32,122 (Apr. 25, 2024) .........................................................*passim*

89 Fed Reg. 32,260 (Apr. 25, 2024) ........................................................1, 20, 54

89 Fed. Reg. 32,302 (Apr. 25, 2024) .......................................................1, 20, 54

89 Fed. Reg. 32,346 (Apr. 25, 2024) ............................................................. 1-2

*Matter of Hughes*, Release No. 4048, 1948 WL 29537 (S.E.C.
Feb. 18, 1948) ......................................................................................31

**OTHER AUTHORITIES**

Bogert, George G., *Confidential Relations and Unenforceable Express
Trusts*, 13 Cornell L. Q. 237 (1927-1028)...................................33, 34, 40, 41

Bogert, George G., et al., *The Law of Trusts & Trustees* (rev. May
2025) ...........................................................................................12, 13

Iowa Commissioner of Insurance, *Comment on DOL's 2024 Proposed
Fiduciary Rule* (Jan. 2, 2024), https://tinyurl.com/3k32ucs7.....................14

National Association of Insurance Commissioners, *Comment on
SEC's Proposed Regulation Best Interest* (Aug. 3, 2018),
https://tinyurl.com/mtpujzxk ................................................................13

National Association of Insurance Commissioners, *State Insurance Regulation* (2011), https://tinyurl.com/2u6kry6d..............................................11

National Association of Insurance Commissioners, *Suitability in Annuity Transactions Model Regulation*, No. 275 (2020), https://tinyurl.com/5cke36dj..........................................................................12

1 Turner, George M., *Revocable Trusts* (Sept. 2016 update)....................................40

**INTRODUCTION**

In 2018, this Court set aside as contrary to law a Department of Labor ("DOL") regulation that sought to impose fiduciary obligations on virtually all insurance agents and broker-dealers, among others, who do business in the retirement savings marketplace with employer-sponsored retirement plans and individual retirement accounts ("IRAs"). Consistent with settled principles of statutory interpretation, this Court held that the governing law—the Employee Retirement Income Security Act ("ERISA")—codified common-law fiduciary standards, and that DOL's efforts to expand the statutory definition of an ERISA "fiduciary" beyond the common law exceeded the agency's statutory authority. *Chamber of Commerce v. DOL*, 885 F.3d 360 (5th Cir. 2018) ("*Chamber*"). Undeterred by this Court's decision, DOL in 2024 attempted again to impose fiduciary obligations on salespersons across the relevant retirement savings marketplace. But the 2024 Rule is invalid for the very same reasons the 2016 rule failed, as district courts in two separate cases held in staying the Rule under 5 U.S.C. § 705.[1]

---

[1] In this brief, "Rule" refers collectively to substantively intertwined regulations that DOL proposed and adopted simultaneously. *See Retirement Security Rule: Definition of an Investment Advice Fiduciary*, 89 Fed. Reg. 32,122 (Apr. 25, 2024); *Amendment to Prohibited Transaction Exemption 2020-02*, 89 Fed. Reg. 32,260 (Apr. 25, 2024); *Amendment to Prohibited Transaction Exemption 84-24*, 89 Fed. Reg. 32,302 (Apr. 25, 2024); *Amendment to Prohibited Transaction*

Appellees here are Texas-based and national associations that represent life insurance companies, insurance agents, brokers, and distributors who issue, market, and sell insurance and security products, including annuities, to retirement savers. Appellees and their members support balanced and effective regulation of the retirement savings marketplace, including enhanced consumer protections recently enacted by the Securities and Exchange Commission ("SEC") and nearly every State across the country. Those regulations require that financial salespeople act in the best interests of their customers but wisely stop short of imposing ill-advised fiduciary obligations.

Ignoring these recent reforms by expert regulators, and in the face of this Court's 2018 ruling, DOL in 2024 relaunched its unlawful and radical intervention in the retirement savings marketplace. In the Rule at issue, DOL seeks once again to transform the retirement savings marketplace by imposing an ERISA "fiduciary" obligation—the highest duty known to the law—on effectively every insurance agent and broker who sells retirement products to retirement savers. Despite claiming to help retirement savers, the Rule, in fact, will be a catastrophe for them. It would impose on sales recommendations substantial, unnecessary burdens deemed counterproductive by other regulators, by redefining essentially

*Exemptions 75-1, 77-4, 80-83, 83-1, and 86-128*, 89 Fed. Reg. 32,346 (Apr. 25, 2024).

all commercial relationships in the retirement savings marketplace as fiduciary. This would drastically and unreasonably raise the costs of assisting consumers and effectively deprive many consumers of useful information about and access to beneficial retirement products (such as annuities). Indeed, such concerns led the SEC and state insurance commissioners *not* to impose fiduciary status on the same market participants.

Faced with an imminent effective date of September 2024 and escalating irreparable injury, including massive compliance costs, Appellees brought suit in the Northern District of Texas (assigned to Judge O'Connor), seeking a preliminary injunction and stay of the Rule's effective date under the Administrative Procedure Act ("APA"). A separate APA lawsuit—now consolidated in this Court only for purposes of appeal—was brought in the Eastern District of Texas (assigned to Judge Kernodle). Each district court granted a stay of the Rule under 5 U.S.C. § 705, with Judge O'Connor adopting fully the reasoning of Judge Kernodle.

Contrary to DOL's contentions, each district court correctly held that the stay factors are readily satisfied. Appellees are "virtually certain to succeed on the merits," as Judge O'Connor determined. ROA.24-10890.1512. In fact, the Rule is contrary to law for precisely the same reasons the 2016 rule was. In vacating that prior regulation, this Court explained that "[a]ll relevant sources indicate" that

ERISA "codified the touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence." *Chamber*, 885 F.3d at 369. The 2016 rule exceeded DOL's authority because it imposed fiduciary status on non-fiduciary sales recommendations and eradicated, rather than respected, the common law's core distinction between sales activity (to which fiduciary status does *not* attach) and paid-for investment advice (to which fiduciary status *does* apply). As the Fifth Circuit concluded in terms directly relevant here, DOL lacks the authority to impose fiduciary status on transactions for which "it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Id.* at 380.

Like the 2016 rule, the 2024 iteration seeks to accomplish DOL's policy preference of "fiduciary-only" regulation by improperly jettisoning DOL's own nearly-half-century-old regulatory test for determining fiduciary status—a test that this Court explained "captured the essence of a fiduciary relationship known to the common law." *Chamber*, 885 F.3d at 365. DOL's attempts to square the 2024 Rule with ERISA's text, as interpreted by this Court in *Chamber*, are as unpersuasive as its efforts were the last time these issues were before this Court.

The remaining stay factors also strongly warrant relief. DOL concedes that, absent a stay, Appellees will suffer irreparable harm. Nevertheless, DOL claims an urgent public need to fill a purported gap in consumer protection. But any claim of

urgency is undercut, if not foreclosed, by DOL's dilatory pace in filing and prosecuting this appeal of the stay decisions, which have now been in effect for roughly fifteen months. What is more, DOL fails to meaningfully grapple with well-documented consumer harms from the Rule or recently bolstered protections for retirement savers under state and federal law, including recently enhanced SEC and state insurance regulations, which will continue to protect consumers while the status quo is preserved pending this litigation. Finally, DOL's arguments about the scope of the stay conflict with Fifth Circuit precedent and are unpersuasive on their own terms.

This Court should affirm.

## JURISDICTIONAL STATEMENT

Appellees agree with Appellants' jurisdictional statement, except to note that jurisdiction would lie under 28 U.S.C. § 1292(a), not § 1291.

## STATEMENT OF ISSUE PRESENTED

Whether the district court properly stayed the effective date of the Rule upon concluding that it was "virtually certain" that the Rule exceeded DOL's statutory authority, that Appellees were likely to suffer irreparable harm without a stay, and that the equities and public interest weighed in favor of a stay.

**STATEMENT OF THE CASE**

**A.     The Importance Of Insurance Products To Retirement Savers**

Today, millions of Americans bear primary responsibility for their retirement savings. These Americans must manage and balance numerous (sometimes competing) risks. They may save too little. They may outlive their savings. The value of their assets may effectively erode through inflation. Or they may make investments that decline in value and provide no financial security. For these reasons, retirement today for many requires more planning than in prior generations.

In this landscape, annuities play a vital role. Annuities are insurance products that guarantee wage-like payments during retirement—protecting retirees against the risk that they will outlive their savings. ROA.24-10890.29. Under an annuity contract, the consumer contributes a principal sum, and in return, the insurer makes payments to the consumer at regular intervals during the consumer's retirement. ROA.24-10890.29.

Annuities are advantageous not only because they provide guaranteed income, but also because they come in a range of forms, which allow consumers to select products that best align with their risk tolerance, financial circumstances, and personal preferences. A "fixed annuity" prioritizes security over the potential for larger returns, by providing payments based on a specified rate of return.

ROA.24-10890.30.  A "fixed indexed annuity" provides the same guarantee while protecting against inflation by basing payment amounts on a minimum rate of return that can increase based on the performance of a market index, like the S&P 500.  ROA.24-10890.30.  With fixed indexed annuities, the change in market index is used to calculate interest on payments; the annuity owner does not actually invest in the market itself.  By contrast, a "variable annuity" enables a consumer to benefit from potential investment market growth; the payment amounts to the consumer are based not only on a selection of guaranteed benefit options, but on the performance of an underlying portfolio of assets (such as stocks and bonds).  ROA.24-10890.30.

Annuities can be purchased through employer-sponsored plans like 401(k)s or through IRAs.  ROA.24-10890.31.  Depending on the type of IRA, contributions can be made pre- or post-tax with investment earnings treated as tax-deferred or tax-free.  ROA.24-10890.31.  IRAs are increasingly important in today's retirement savings marketplace because they are independent from any employer and are highly portable.  When individuals change jobs or retire, they can transfer—or "roll over"—assets from an employer-sponsored account to their own IRA.

Recognizing the protections that annuities provide to retirement savers, Congress has acted on multiple occasions to promote their availability and

utilization through IRAs and 401(k)s.  In 2019, Congress passed the SECURE Act, which (among other things) increased annuities' portability between 401(k)s by removing certain penalties; reduced the liabilities and burdens on 401(k) plan trustees when selecting annuity providers; and required employer-sponsored plans to provide employees with an annual estimate of the monthly retirement income their account balance could generate in the form of an annuity.  *See* Pub. L. No. 116-94, div. O, §§ 109, 204, 133 Stat. 3137, 3148-3152, 3165-3166 (2019).  In 2022, Congress passed the SECURE Act. 2.0, which allowed greater year-to-year benefit increases for lifetime annuities; increased and removed caps on the amount of money from a retirement account that can be used to purchase annuities; and eliminated a "partial annuitization penalty" on consumers who use funds from a tax-advantaged account to invest in an annuity.  Pub. L. No. 117-328, div. T, §§ 201-202, 204, 136 Stat. 5275, 5330-5332, 5334-5335 (2022).

### B.      The Marketing And Distribution Of Annuities

Consumers making decisions about their retirement savings need access to truthful information about the products available to them, including annuities. Many retail consumers obtain this information the same way they learn about other products: through a conversation with a salesperson.

To sell any type of annuity, the salesperson must be a state-licensed insurance agent.  ROA.24-10890.32.  In addition, because variable annuities (and

some fixed indexed annuities) are considered to be securities under federal law, a person selling those products must also be a broker-dealer registered with the SEC. ROA.24-10890.32. Some agents and brokers are affiliated with a single insurance company and devote most of their efforts to that insurer's products. Others are independent and sell products from a range of insurers. These independent agents often operate as small businesses and may work with third parties known as independent marketing organizations for sales, marketing, training, contracting, and other ongoing support. ROA.24-10890.32-33.

Given the variety of individualized features available in annuity contracts, it takes significant time and knowledge to educate consumers about them. To compensate salespersons for their time and effort, the insurance company—not the customer—typically pays the agent or broker a commission for completed sales. ROA.24-10890.33. The primary alternative to commission-based compensation is a fee-for-advice model, under which typically wealthier consumers hire a registered investment adviser ("RIA") to manage their investments on an ongoing basis, and the consumer pays the RIA a regular fee equal to a percent of the total "assets under management." ROA.24-10890.33. Under federal law, these investment advisers who are paid for advice, rather than sales, have long been deemed fiduciaries. ROA.24-10890.33; *see also* 15 U.S.C. § 80b-2(a)(11) (excluding from definition of "investment adviser" any broker-dealer who provides

advice "solely incidental to the conduct of his business as a broker or dealer" and "receives no special compensation" for that advice).

The key prerequisite in a fee-for-advice arrangement is ongoing advice concerning a fluid portfolio. Annuities, on the other hand, are often sold as one-time transactions, for which follow-on advice or investment management is generally unnecessary. ROA.24-10890.33. In addition, the economics of a fee-for-advice model usually require an account balance minimum (typically between $100,000 and $250,000) that less wealthy consumers cannot meet. ROA.24-10890.33-34. And even where the consumer can meet the minimum, the standard 1% annual fee is likely to cost more over time than a one-time commission paid by the insurer. ROA.24-10890.34. Imposing a fee-for-service requirement on all insurance agents and broker-dealers, and eliminating commission-based sales, would consequently raise costs, impede access, and reduce choices for consumers seeking financial security in retirement.

### C.    State And SEC Regulation Of Annuities

Annuities have long been heavily regulated to ensure that consumers' interests are appropriately protected. As insurance products, all annuities are subject to comprehensive state insurance laws governing insurer licensing, insurance-agent licensing, product regulation, market conduct, financial regulation, and consumer services. ROA.24-10890.35-36. These laws are often informed by

model laws and regulations adopted by the National Association of Insurance Commissioners ("NAIC"), a standard-setting organization composed of the chief insurance regulators from the fifty States and the District of Columbia. *See* NAIC, *State Insurance Regulation* (2011), https://tinyurl.com/2u6kry6d.

On top of state regulation, annuities that are securities are subject to regulation by the SEC, and broker-dealers who sell annuities are regulated by FINRA—a self-regulatory organization of broker-dealers—under the SEC's oversight. ROA.24-10890.39. This shared responsibility among the States and the SEC has been approved by Congress: The 2010 Dodd-Frank Act provided that fixed indexed annuities sold in States that adopt the NAIC's model regulation are "treat[ed] as exempt securities," not subject to SEC regulation. Pub L. 111-203, § 989J, 124 Stat. 1376, 1949-1950 (2010). The Dodd-Frank Act also authorized the SEC to promulgate heightened standards concerning broker-dealers' recommendations of non-exempt securities, including variable annuities. *Id.* § 913(g)(1), 124 Stat. at 1828.

Following Dodd-Frank, the SEC and the NAIC have worked to enhance consumer protections. In 2019, the SEC promulgated Regulation Best Interest (or "Reg BI"), which strengthens the standards applicable to brokers "making a recommendation of any securities transactions," including one involving a variable annuity. 17 C.F.R. § 240.15*l*-1(a)(1). The following year, the NAIC revised its

- 11 -

model regulations.  Forty-nine States have now adopted NAIC's revised model regulation, and the remaining State (New York) had already adopted a similar standard before the NAIC revisions.

Both Reg BI and the revised NAIC model require salespeople recommending an annuity to "act in the best interest of the retail customer … , without placing" their own "financial or other interest … ahead of the interest of the retail customer."  17 C.F.R. § 240.15*l*-1(a)(1); *accord* NAIC, *Suitability in Annuity Transactions Model Regulation*, No. 275 § 6(A) (2020) ("NAIC 2020 Model Regulation"), https://tinyurl.com/5cke36dj.  They also impose similar care, disclosure, documentation, and conflict-of-interest requirements.  *See* 17 C.F.R. § 240.15*l*-1(a)(2); NAIC 2020 Model Regulation § 6.

Importantly, both the SEC and the NAIC explicitly elected not to impose fiduciary obligations.  The SEC explained that it declined to "subject broker-dealers to a wholesale and complete application of the existing fiduciary standard."  84 Fed. Reg. 33,318, 33,322 (July 12, 2019).  The NAIC model regulation states that its "requirements … do not create a fiduciary obligation or relationship."  NAIC 2020 Model Regulation § 6(A)(1)(d).  Those limitations reflect that fiduciary obligations have historically been limited to unique and special circumstances, where an "intimate relationship[]" of "trust and confidence" exists between the parties.  Bogert et al., *The Law of Trusts & Trustees* § 481 (rev. May

- 12 -

2025).  Where an intimate relationship of trust and confidence does exist, the common law has held fiduciaries "to the highest amount of loyalty and good faith," required them to "exclude all selfish interest," and "prohibited" them "from putting themselves in positions where personal interest and representative interest will conflict."  *Id.*  But such a relationship does not usually exist in "an arm's length commercial transaction," like the "sale of insurance."  *Pitts v. Jackson Nat'l Life Ins. Co.*, 574 S.E.2d 502, 508 (S.C. Ct. App. 2002).

The SEC's and insurance commissioners' decisions not to impose fiduciary obligations were informed choices.  As the SEC explained, subjecting broker-dealers to fiduciary standards would likely "significantly reduce retail investor access to differing types of investment services and products, reduce retail investor choice …, and increase costs for retail investors of obtaining investment recommendations."  84 Fed. Reg. at 33,322.  In addition, the SEC determined that a fiduciary standard is not "appropriately tailored to the structure and characteristics of the broker-dealer business model," which "is generally transactional and episodic."  *Id.* at 33,321-33,322.  The NAIC made a similar determination:  A fiduciary standard "does not correspond with the transactional, sales relationship between the [insurance agent] and the consumer."  NAIC, *Comment on SEC's Proposed Regulation Best Interest* 4 (Aug. 3, 2018), https://tinyurl.com/mtpujzxk.  As Iowa's Insurance Commissioner (one of the

- 13 -

leaders of the NAIC's working group) later elaborated, the NAIC rejected a fiduciary standard because it "inherently restricts business models that many [consumers] rely on to gain cost-effective access to the financial security products they need."  Iowa Commissioner of Insurance, *Comment on DOL's 2024 Proposed Fiduciary Rule* 6 (Jan. 2, 2024), https://tinyurl.com/3k32ucs7.

### D.     ERISA Fiduciary Obligations

Enacted by Congress in 1974, ERISA comprises two main parts.  Title I is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).  To advance that purpose, Title I imposes strict duties of loyalty and prudence on "fiduciar[ies]" of 401(k)s and other employer-provided plans.  *See* 29 U.S.C. § 1104.  "ERISA's duty of loyalty is 'the highest known to the law,'" *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 294 (5th Cir. 2000), and requires that fiduciaries act "solely in the interest of the participants and beneficiaries and … for the exclusive purpose of … providing benefits to participants and their beneficiaries," 29 U.S.C. § 1104(a)(1)(A).  The duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."  *Id.* § 1104(a)(1)(B).

In addition, Title I subjects fiduciaries of an employer-sponsored benefit plan to "prohibited transaction" provisions, which bar them from "receiv[ing] any consideration" (like a commission) "from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b)(3).  Title I makes fiduciaries personally liable for any losses to the plan caused by violations of the statutory requirements—including violations of the fiduciary duties and prohibited transaction provisions—and it authorizes both DOL and private parties to enforce fiduciaries' obligations.  *Id.* §§ 1109, 1132. Violations of prohibited transaction provisions are also subject to an excise tax, enforceable by the IRS.  26 U.S.C. § 4975.

Title II of ERISA creates tax-deferred personal IRAs and similar accounts within the Internal Revenue Code.  Title I does not cover these non-employer-sponsored plans, which give individuals greater control over the underlying investments.  Title II, furthermore, does not subject IRA fiduciaries to the same Title I duties of loyalty and prudence; it does not hold those fiduciaries personally liable for losses to IRA owners; and it does not provide the Secretary or IRA holders a right of action.  *See* 26 U.S.C. § 4975.  Title II fiduciaries are, however, subject to analogous prohibited transaction provisions, again enforceable by the IRS through an excise tax penalty.  *Id.* § 4975(a)-(b).

Title I and Title II of ERISA define "fiduciary" in the same way. Under the statute, fiduciary status attaches to those who exercise certain authority or control over plans and IRAs and (as relevant here) to those who "render[] investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of" an IRA or employer-sponsored plan. 29 U.S.C. § 1002(21)(A); *accord* 26 U.S.C. § 4975(e).

In 1975, one year after Congress enacted ERISA, DOL promulgated a regulation establishing a five-part test—each part of which must be satisfied—to determine when a person "renders investment advice … for a fee." Under that test, fiduciary obligations attach when a person (1) renders advice as to the value of securities or other property or makes investment recommendations, (2) "on a regular basis to the plan," (3) "pursuant to a mutual agreement, arrangement, or understanding" with the plan that (4) the advice will serve as a "primary basis for investment decisions with respect to plan assets," and (5) the advice is "individualized" "based on the particular needs of the plan." 40 Fed. Reg. 50,842, 50,843 (Oct. 31, 1975) (codified at 29 C.F.R. § 2510.3-21(c)). Consistent with the common law's longstanding requirement that fiduciary relationships involve intimate relationships of trust and confidence, DOL's 1975 test—particularly its requirements that advice be provided on a regular basis and pursuant to a mutual

arrangement—generally did not reach sales recommendations, like a recommendation to purchase an annuity.

For decades, DOL refined application of its five-part test through the issuance of prohibited transaction exemptions ("PTEs"), which allow those who might qualify as fiduciaries to engage in transactions that would otherwise be a prohibited transaction. In 1977, DOL issued "PTE 84-24," which made clear that even where "insurance agent[s] or broker[s]" happened to satisfy the five-part test, they could receive a "sales commission from an insurance company in connection with the purchase … of an insurance or annuity contract." 49 Fed. Reg. 13,208, 13,211 (Apr. 3, 1984); *see also* 42 Fed. Reg. 32,395 (June 24, 1977).

### E.      The Department's Vacated 2016 Fiduciary Rule

DOL's 1975 definition of "investment advice fiduciary" governed uninterrupted for four decades. But in 2016 DOL sought to abandon the five-part test and impose fiduciary status whenever a person made a "recommendation" to a retirement saver "as to the advisability of acquiring, holding, disposing of, or exchanging, securities or other investment property." 81 Fed. Reg. 20,946, 20,948 (Apr. 8, 2016). The 2016 rule no longer required that investment advice be provided "on a regular basis," "pursuant to a mutual agreement," or "as a primary basis for investment decisions" to trigger fiduciary obligations. DOL's principal legal defense of abandoning these historical requirements was its assertion that

ERISA's fiduciary definition was not tied to the common law and permitted the agency to define the term "more broadly" than the common law. *Id.* at 20,990.

This Court disagreed and vacated the 2016 rule in its entirety. *Chamber*, 885 F.3d at 388. "[A]ll relevant sources," the Court held, "indicate that Congress codified the touchstone of common law fiduciary status—the parties' underlying relationship of trust and confidence." *Id.* at 369. That conclusion was reinforced by ERISA's use of the phrase "advice for a fee," because "the preposition 'for' … indicates that the purpose of the fee is not 'sales' but 'advice.'" *Id.* at 373. DOL's 1975 five-part test "flowed directly from contemporary understanding of 'investment advice for a fee'" because it "contemplated an intimate relationship between the adviser and client beyond ordinary buyer-seller interactions." *Id.* at 374. The 2016 rule, on the other hand, "lack[ed] any requirement of a special relationship." *Id.* at 377. Indeed, it "expressly include[d] one-time … annuity transactions where it is ordinarily inconceivable that financial salespeople or insurance agents will have an intimate relationship of trust and confidence with prospective purchasers." *Id.* at 380. In this way and others, the Court held, the rule unlawfully disregarded the "dichotomy between mere sales conduct, which does not usually create a fiduciary relationship …, and investment advice for a fee, which does." *Id.* at 374.

DOL did not seek further review of this Court's *Chamber* decision.

**F.    The Department's 2024 Attempt To Repackage The 2016 Rule**

DOL promulgated the Rule challenged here in April 2024, with an effective date of September 23, 2024.  89 Fed. Reg. 32,122 (Apr. 25, 2024).  Like the 2016 rule, the Rule abandons the 1975 test, including its requirements that fiduciary investment advice be provided on a "regular basis" and "pursuant to a mutual agreement" and that the advice serve as the "primary basis" for investment decisions.  *Id.* at 32,124.

In place of the 1975 standard, the Rule provides for fiduciary status to attach whenever two broad elements are satisfied.  First, the Rule potentially covers anyone who "either directly or indirectly … makes professional investment recommendations to investors on a regular basis as part of their business."  89 Fed. Reg. at 32,122.  That condition is, of course, satisfied by effectively every insurance agent and broker-dealer in the country.  Second, under what DOL calls "an objective facts and circumstances test," fiduciary status is triggered whenever a "recommendation is made under circumstances that would indicate to a reasonable investor" that the recommendation:  (i) "is based on review of the retirement investor's particular needs or individual circumstances"; (ii) "reflects the application of professional or expert judgment to the retirement investor's particular needs"; and (iii) "may be relied upon by the retirement investor as intended to advance the retirement investor's best interest."  *Id.* at 32,122, 32,149.

- 19 -

Like the 2016 rule, this definition would sweep in essentially any recommendation to a retirement saver to purchase a retirement product.

Alongside this expansive definition of "fiduciary," the Rule revised PTE 84-24 (the exemption historically applicable to sales commissions for insurance agents) and PTE 2020-02 (a newer exemption issued after the 2016 rule was vacated). DOL claimed these revisions would allow agents and brokers to receive sales commissions despite their fiduciary status, but in reality, the PTEs impose costly obligations on insurance agents, brokers, distributors, and insurers.

Among those obligations is a requirement that the newly deemed fiduciaries provide a "written acknowledgment" stating that they are "providing fiduciary investment advice and … are fiduciaries under Title I, [Title II], or both." 89 Fed. Reg. at 32,226. This "written acknowledgement" would have the apparent (and presumably intended) effect of subjecting regulated parties to state-law claims for breach of contract or fiduciary obligations, and preventing them from disputing fiduciary status in such lawsuits. Additionally, the PTEs subject all newly established fiduciaries to "Impartial Conduct Standards" that mirror the fiduciary duties of loyalty and care that Congress included in Title I, but excluded from Title II. *See id.* at 32,298, 32,343-32,344.

### G. Proceedings Below

In May 2024, Appellees filed this lawsuit in the Northern District of Texas to vacate the Rule, while also seeking a preliminary injunction and stay of the Rule's effective date. Appellees' complaint raised numerous challenges to the Rule, but Appellees sought preliminary relief based only on claims that the Rule is contrary to law and fatally conflicts with *Chamber*, preserving other claims (including arbitrary-and-capricious challenges) for later stages of the litigation.[2]

A separate challenge to the new fiduciary definition and proposed amendment to PTE 84-24 was brought in the Eastern District of Texas by the Federation of Americans for Consumers Choice ("FACC"), among others. In the FACC case, the district court (Judge Kernodle) stayed the effective date of the new fiduciary definition and amended PTE 84-24 on July 25, 2024. ROA.24-10890.1461-1462. In concluding that the FACC plaintiffs were likely to succeed on the merits, Judge Kernodle held that, like the 2016 rule, the Rule eliminates the "regular basis" and "primary basis" requirements of DOL's 1975 test, impermissibly "captur[ing] transactions that do not satisfy the established 'relationships of trust and confidence' contemplated by ERISA." ROA.24-10890.1486. Judge Kernodle also explained that the Rule "dispenses with"

---

[2] The Financial Services Institute and Securities Industry and Financial Markets Association intervened in the suit and will file a separate brief in this appeal.

ERISA's requirement that the fee at issue "be paid for investment *advice*, not for a mere recommendation," ROA.24-10890.1488; "conflicts with ERISA by ignoring the distinction between" Title I and Title II, ROA.24-10890.1489; and violates the major questions doctrine because it "effect[s] a fundamental revision of the statute" that would "transform the trillion dollar-market for IRA investments, annuities, and insurance products," ROA.24-10890.1492.

The next day, in Appellees' case, Judge O'Connor issued an order staying the effective date of the Rule in its entirety (including all PTE amendments). ROA.24-10890.1511-1513.  Judge O'Connor held that Appellees were "virtually certain to succeed on the merits," and "fully agree[d]" with and "adopt[ed]" Judge Kernodle's analysis.  ROA.24-10890.1512-1513.  Judge O'Connor further explained that, "[l]ike the 2016 rulemaking, the Rule overrides th[e] 'important distinction'" "between insurance agents and brokers—who are 'compensated only for completed sales'—and investment advisers—who are 'paid fees because they render advice.'"  ROA.24-10890.1514.

With respect to the remaining stay factors, Judge O'Connor found that DOL "rightfully" did not dispute the irreparable harm facing plaintiffs because DOL itself estimated the Rule "will cause more than a half a billion dollars in compliance costs" in the first year plus "$2.5 billion in costs … over the next decade," and "[d]eclarations in the record confirm these costs."  ROA.24-

10890.1516. Judge O'Connor also found that the balance of the equities and the public interest favored a stay of the effective date because "there is no public interest in the perpetuation of unlawful agency action." ROA.24-10890.1518.

## SUMMARY OF ARGUMENT

I.     The district court correctly held that Appellees are likely to succeed on the merits of their claim that the Rule is contrary to law for several reasons. First, and most fundamentally, the Rule's new definition of "fiduciary" abandons the common-law limits this Court has held are codified in ERISA. Like the vacated 2016 regulation, the Rule eviscerates the common-law distinction between sales recommendations made on commission paid by the issuer of the retirement product and investment advice rendered for a fee paid by the retirement saver. And it improperly eliminates the longstanding "regular basis," "primary basis," and "mutual agreement" elements of DOL's 1975 test, which this Court has recognized capture the essence of a fiduciary relationship at common law.

Beyond its expansive definition of fiduciary, the Rule exceeds DOL's authority in additional ways: It usurps authority that the Dodd-Frank Act delegated to the SEC or reserved to the States. It eviscerates the important distinction between Title I and Title II fiduciaries. And through the written acknowledgement requirement in PTEs 84-24 and 2020-02, the Rule unlawfully authorizes private enforcement that ERISA does not provide for in Title II. As in

the district court, DOL's contrary arguments on appeal are nothing more than an attempt to relitigate this Court's decision in *Chamber*.

II.     The remaining stay factors are satisfied as well.  DOL does not dispute that the Rule will inflict irreparable harm on Appellees' members in the form of unrecoverable compliance costs (among other injuries).  Moreover, both the equities and the public interest favor relief to ensure that government agencies like DOL comply with the law.  And here, in particular, there is a strong public interest in preventing consumers from losing access to important retirement products.  DOL can identify no persuasive reason why the status quo should not be preserved pending a final resolution of Appellees' challenges, particularly given that the stay has now been in effect for roughly fifteen months.

III.    Finally, DOL's argument that the stay should be limited to the parties who brought suit conflicts with precedent and is wrong.  This Court has held, based on statutory text and longstanding administrative law principles, that the default relief under the APA is not party-limited.  And in this case, a universal stay is especially appropriate because piecemeal relief against a Rule that prescribes uniform standards would prove unwieldy and cause confusion.  At a minimum, the stay must extend to Appellees' members.

## STANDARD OF REVIEW

The APA authorizes courts "to postpone the effective date of an agency action" "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705.  A plaintiff is entitled to a stay of effective date if (1) it is likely to succeed on the merits; (2) it faces "a substantial threat of irreparable harm" absent relief; (3) the threatened injury outweighs the harm to the opposing party; and (4) the public interest will be served by staying the effective date.  *Career Colleges & Schools of Tex. v. Department of Education*, 98 F.4th 220, 233 (5th Cir. 2024).  In reviewing a stay, this Court "review[s] legal conclusions *de novo* and findings of fact for clear error."  *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210, 241-242 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024).

Under the APA, courts "shall … set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitation."  5 U.S.C. § 706(2)(C).  In deciding whether DOL has exceeded its statutory authority, this Court must "determine the 'best' reading of a statute; a merely 'permissible' reading is not enough."  *Van Loon v. Department of the Treasury*, 122 F.4th 549, 563 (5th Cir. 2024); *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).

# ARGUMENT

## I. THE RULE IS CONTRARY TO LAW

It is axiomatic that "[a] regulator's authority is constrained by the authority that Congress delegated it by statute." *Chamber*, 885 F.3d at 369. The last time DOL attempted to fundamentally transform ERISA's definition of "fiduciary," unmooring it from settled common-law standards, this Court vacated the rule. The Rule here is indistinguishable in scope. For that reason, among others, Appellees "are virtually certain to succeed on the merits"; indeed, the Rule "conflicts with ERISA in several ways," as Judge O'Connor held. ROA.24-10890.1512-1513.

### A. The Rule Exceeds DOL's Statutory Authority

The Rule's central vice is its expansive definition of "fiduciary." As relevant, ERISA provides that "a person is a fiduciary to the extent … he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property" of an ERISA-covered plan or IRA. 29 U.S.C. § 1002(21)(A); *accord* 26 U.S.C. § 4975(e). *Chamber* held that provision "codifie[s] the touchstone of common law fiduciary status," which "turns on the existence of a relationship of trust and confidence between the fiduciary and client"—a relationship that goes "beyond ordinary buyer-seller interactions." 885 F.3d at 369-370, 374. That meaning of "fiduciary" has deep roots in the

common law of trusts, and courts presume that "Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Id.* at 370.

That common-law presumption is reinforced, *Chamber* reasoned, by ERISA's use of the phrase "advice for a fee." 29 U.S.C. § 1002(21)(A)(ii). "[T]he preposition 'for' … indicates that the purpose of the fee is not 'sales' but 'advice.'" *Chamber*, 885 F.3d at 373. ERISA's text thus closely aligns with the "structure of the financial services industry," which has long distinguished between, on the one hand, "[s]tockbrokers and insurance agents … compensated only for completed sales" and, on the other hand, "[i]nvestment advisers … paid fees because they 'render advice.'" *Id.* at 372-373. DOL's 1975 regulation "flowed directly" from this "contemporary understanding" of "investment advice for a fee," because it limited fiduciary obligations to circumstances where there was "an intimate relationship between adviser and client." *Id.* at 374. The 2016 rule's sweeping fiduciary standard, this Court held, "fatally conflict[ed] with the statutory text and contemporary understandings." *Id.* at 376.

This Rule is unlawful for the same reasons. In at least three ways, the Rule defies Congress's choice to codify the common-law fiduciary standard. First, like the 2016 rule, the Rule extends fiduciary duties to "ordinary buyer-seller interactions," erasing the distinction between sales recommendations made on commission and investment advice rendered for a fee. *Chamber*, 885 F.3d at 374.

Second, again like the 2016 rule, the Rule eliminates the 1975 test's "regular basis" and "primary basis" elements, untethering the fiduciary standard from any "intimate relationship" of "trust and confidence." *Id.* at 380. Third, the Rule imposes fiduciary duties in the absence of any "mutual agreement to provide individualized advice," precluding parties from structuring their relations through contractual language, a hallmark of the common law. *Id.* at 374.

Each of these flaws is reinforced, moreover, by both the major questions doctrine and constitutional avoidance canon, which weigh against DOL's newfound claim of far-reaching authority to regulate truthful sales speech after interpreting ERISA for half a century to confer no such power.

### 1. The Rule unlawfully dispenses with the common law's distinction between sales speech and fiduciary investment advice

As the district court correctly held, the Rule's first decisive flaw is that it effectively redefines all sales speech as fiduciary speech. *See* ROA.24-10890.1513-1514. In doing so, it countermands *Chamber*, which vacated the 2016 rule in large part because it eliminated the distinction "between mere sales conduct, which does not usually create a fiduciary relationship under ERISA, and investment advice for a fee, which does." 885 F.3d at 374.

a. To start, DOL cannot seriously contest that the Rule imposes fiduciary standards on nearly all recommendations by insurance agents or broker-dealers to

retirement savers.  The Rule's first element applies to any person who "makes professional investment recommendations to investors on a regular basis as part of their business."  89 Fed. Reg. at 32,256.  That element will be satisfied by every insurance agent or broker-dealer in the country, as DOL surely understood.

The Rule's second element—the so-called "objective facts and circumstances" test—is also broadly calibrated to impose fiduciary status on all sales recommendations by insurance agents or brokers to retirement savers.  That test is satisfied whenever a recommendation (1) "is based on review of the retirement investor's particular needs or individual circumstances"; (2) "reflects the application of professional or expert judgment"; and (3) "may be relied upon by the retirement investor as intended to advance the retirement investor's best interest."  89 Fed. Reg. at 32,256.  Critically, each of these sub-elements will be satisfied every time an insurance agent or broker makes a sales recommendation to a retirement saver.  After all, such recommendations would not be useful if they did not satisfy the first two sub-elements—that is, if they were not based on a consumer's "particular needs or individual circumstances" or "reflect[] … professional or expert judgment."  *Id.*  And both the NAIC model rule (adopted by the vast majority of States) and the SEC's Reg BI require that sales recommendations meet DOL's third sub-element—namely, that recommendations be intended "to advance the retirement investor's best interests."  *Id.*

In purpose and effect, then, the Rule declares by regulatory fiat that effectively all sales speech in the covered retirement marketplace is now paid-for fiduciary advice—the same result as the vacated 2016 rule.  Worse, DOL hopes to accomplish this legal maneuver by bootstrapping the *non*-fiduciary standards of other regulators (the States and the SEC) into a *fiduciary* obligation.  Under the Rule, fiduciary status is triggered by any sales recommendation to a retirement saver made by any financial professional in compliance with existing state or SEC regulations.  The Rule thus repeats the 2016 rule's signal flaw:  It causes "any financial services or insurance salesman who lacks a relationship of trust and confidence with his client [to] nonetheless be deemed a fiduciary."  *Chamber*, 885 F.3d at 379 n.13.

This conflation of ordinary sales speech and fiduciary advice clashes with "the common law understanding" that ERISA codified.  ROA.24-10890.1513.  As this Court held in *Chamber*, the common law reflects the "widely shared understanding that financial salespeople are not fiduciaries absent [a] special relationship."  885 F.3d at 376.  For example, the common law has long held that merely recommending the purchase of an insurance product "does not give rise to a fiduciary relationship."  *Pitts*, 574 S.E.2d at 508 (collecting cases across jurisdictions); *see also, e.g.*, *Erie Ins. Co. v. Hickman ex rel. Smith*, 622 N.E.2d 515, 518 (Ind. 1993) (purchase of insurance policy is "a traditional arms-length

dealing between two parties"); *Stockett v. Penn Mut. Life Ins. Co.*, 106 A.2d 741, 744 (R.I. 1954) ("Ordinarily an insurance company stands in no fiduciary relationship to a legally competent applicant for an annuity"); *Hult v. Home Life Ins. Co. of N.Y.*, 240 N.W. 218, 228 (Iowa 1932) (it does not "constitute a confidential relationship as the term is used in the law" when an agent "merely provid[es] annuity contracts … at the annuitant's request"). Similarly, brokers have not assumed fiduciary obligations simply by recommending the purchase of a security. *E.g.*, *Matter of Hughes*, Release No. 4048, 1948 WL 29537, at *7 (S.E.C. Feb. 18, 1948) (broker-dealers are not fiduciaries "unless they have by a course of conduct placed themselves in a position of trust and confidence as to their customers").

*Chamber*'s conclusion that sales transactions do not typically trigger fiduciary obligations also accords with ERISA case law. Courts (including this one) have long held that "[s]imply urging the purchase of its products does not make an insurance company an ERISA fiduciary." *American Fed'n of Unions Loc. 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of U.S.*, 841 F.2d 658, 664 (5th Cir. 1988); *see also Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1278-1279 (11th Cir. 2005) ("Cases holding that insurers … are not ERISA fiduciaries are numerous."). Similarly, in holding that an insurance agent was not an ERISA fiduciary, notwithstanding a plaintiff's claim that it

"relied heavily on [the agent's] advice," the Eighth Circuit held the agent was "not providing investment advice," but "was merely a salesperson" "selling his company's financial products." *Consolidated Beef Indus., Inc. v. New York Life Ins. Co.*, 949 F.2d 960, 964-965 (8th Cir. 1991). Because the Rule imposes fiduciary status on essentially all insurance agents and broker-dealers in making retirement recommendations, it sharply breaks from the common law and established ERISA precedent.

b. The Rule's conflict with the statute is also clear based on ERISA's "advice for a fee" requirement. 29 U.S.C. § 1002(21)(A)(ii). In tying fiduciary status to "advice for a fee," Congress intended to capture circumstances in which the "purpose" of a fee is for "advice," not "sales." *Chamber*, 885 F.3d at 373. This "statutory language" "preserves" the "important distinction" between insurance agents and brokers—who are "compensated only for completed sales"— and investment advisers—who are "paid fees because they 'render advice.'" *Id.* ERISA thus "requires that the professional be paid for advice—not for a sale—to be a fiduciary." ROA.24-10890.1487; *accord* ROA.24-10890.1513.

Like the 2016 rule, the Rule unlawfully "dispenses with this distinction." *Chamber*, 885 F.3d at 372-373. DOL posits that, under the Rule, the "advice for a fee" requirement is satisfied so long as a "link" exists between the commission and a "recommendation." 89 Fed. Reg. at 32,158. And that link "exists," according to

DOL, either if the compensation was "for the provision of advice" or if the compensation would not "have been paid but for the recommended transaction" (i.e., a sales commission). *Id.* The Rule accordingly treats fees "for the provision of advice" and sales-based compensation as the same thing. DOL "read[s]" *Chamber* as "not foreclosing" its position, *id.* at 32,159 n.221, but this Court could not have been clearer that agents and brokers are typically compensated "for" sales, not advice.

  c. DOL's defenses of the Rule's application to sales speech fail.

  DOL's principal move (Br.28-29) is to argue that the Rule is "fully consistent" with *Chamber* because "the Rule … capture[s] individuals who serve as 'trusted advisers.'" Indeed, the premise for DOL's entire argument on appeal is that "salespeople sometimes obtain investors' trust" and, on that basis, "are … appropriately classified as fiduciaries." Br.37. But this defense rests on a fundamental category mistake, by wrongly assuming that providing consumers trustworthy, valuable, or accurate information is sufficient to establish a fiduciary relationship. Those are also hallmarks of many sales relationships. Indeed, most commercial relationships carry with them duties of honesty, good faith, and fair dealing. Thus, at common law, "not every kind of confidence" established a fiduciary relationship. Bogert, *Confidential Relations and Unenforceable Express Trusts*, 13 Cornell L. Q. 237, 245 (1928). Rather, a special, intimate relationship

was critical.  For example, although "[a] customer of a food dealer relies on his grocer to furnish wholesome food, and to give honest measure for fair prices," "[t]his is not the trust and confidence necessary to create" a fiduciary relationship under the common law.  *Id.*

To be sure, selling insurance or other retirement products is not the same as selling food, but the underlying point is the same.  Simple "expressions that the parties … trust and have confidence in each other" are typically insufficient to establish fiduciary relationships because "[t]he same could be said … about most of the people we deal with every day."  *Crawford Painting & Drywall Co. v. J.W. Bateson Co.*, 857 F.2d 981, 985-986 (5th Cir. 1988) (applying Texas fiduciary law).  That is precisely one of the reasons that, at common law, insurance sales did not give rise to fiduciary obligations, even though many such transactions undoubtedly involved degrees of trust.  *See supra* pp.30-31 (collecting authority).

What is more, DOL identifies no persuasive evidence that the Rule's invented "objective" test actually "captures individuals whose conduct would elicit a reasonable investor's 'trust and confidence.'"  Br.29.  Again, *Chamber* teaches that fiduciary status can attach only to "special relationship[s]" of "trust and confidence."  885 F.3d at 376.  This Court also deemed it "ordinarily inconceivable," as a factual matter, that this standard could be satisfied in most consumer interactions with insurance agents and brokers involving retirement

products.  *Id.* at 380.  Given those conclusions, one would have thought that, before again attempting a sweeping redefinition of the retirement marketplace, DOL would have tried to build a factual record establishing that many, if not most, sales interactions between consumers and insurance agents or brokers do, in fact, involve "intimate relationship[s]" of "trust and confidence," characteristic of common-law fiduciary relations.  *Id.*

DOL did not do any of that, presumably because it could not marshal those facts.  Instead, DOL conclusively presumes that "parties *should* reasonably understand" that a relationship of trust and confidence exists when the Rule's test is satisfied, 89 Fed. Reg. at 32,152 (emphasis added), without identifying any evidence that it is how consumers *actually* understand such relationships in the real world.  *See* Br.29 (asserting that "by definition" someone who satisfies the Rule's test satisfies *Chamber*'s fiduciary standard).  But agency-created presumptions must, at the least, reflect a "rational nexus between the proven facts and the presumed facts"; an agency may not, as DOL does here, adopt a presumption based on "policy to avoid the necessity for finding that which the legislature requires to be found."  *United Scenic Artists, Loc. 829, Bhd. of Painters & Allied Trades, AFL-CIO v. NLRB*, 762 F.2d 1027, 1034 (D.C. Cir. 1985); s*ee also NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 787 (1979).  To the extent DOL believes (Br.14) that simply reciting the phrase "'trust and confidence' … on 80 occasions" or

citing "*Chamber* more than 40 times" in the regulatory preamble somehow excuses the absence of a factual record for the agency's presumption, that obviously is not the law.

Perhaps recognizing that the agency's *ipse dixit* is not a substitute for fact-finding, DOL points (Br.36-37) to hearing testimony from an insurance agent (and former association president) who stated he does not view himself "as *just* a salesperson" and that he has "a *sort of* relationship of trust and confidence" with clients. ROA.24-10890.1027, 1031 (emphases added). But setting aside whether the testimony of one agent could provide factual support for an industry-wide finding, DOL is playing word games—confusing the trust buyers often place in salespersons with the kind of intimate relationship necessary for fiduciary obligations to attach. That certain of Appellees' members describe themselves as "advisors," ROA.24-10890.21-22, is no justification for the Rule either. As DOL acknowledges (citing *Chamber*), "an individual's status as a fiduciary turns not on their formal job title, but on whether they *'act* as a fiduciary." Br.36 (brackets omitted). And the Supreme Court has recognized that ERISA fiduciary duties attach only when financial professionals "cross the line from advisor to fiduciary," *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993), making clear that the title "advisor" carries no special connotation of fiduciary status. Much less does the title bear on whether the advisor "acts" as a fiduciary.

Resisting the unavoidable fact that the Rule transforms virtually all sales speech by insurance agents and broker-dealers into fiduciary advice, DOL asserts that the Rule "bears no resemblance to the [2016 fiduciary] definition at issue in *Chamber*" but is instead "far narrower." Br.30-31. That is decidedly wrong. As Appellees have shown, the Rule is indistinguishable in scope from the 2016 rule, in that it seeks to transform virtually all insurance agents and brokers who recommend retirement products in compliance with state and federal regulations into fiduciaries, without regard to whether those relationships actually are or would be "fiduciary" at common law. *See supra* pp.28-30.

The two supposedly "narrowing" mechanisms DOL identifies underscore how weak DOL's position is. First, DOL points to the Rule's requirement that covered recommendations be "intended to advance the retirement investor's best interest." Br.30. But that is no limitation at all. State and SEC requirements obligate *all* insurance agents and broker-dealers to make *all* retirement recommendations under a best interest standard. *See supra* pp.11-12. The inclusion of this element in the Rule is evidence of DOL's irrational bootstrapping, as explained above, not a basis for concluding the Rule is narrow.[3]

---

[3] At the time of the *Chamber* decision, insurance agents were subject to heightened state-law "suitability" requirements that went well beyond what applied to other traditional salespersons. *See* 885 F.3d at 385. This Court nonetheless concluded that annuity transactions regulated by these suitability rules typically involved non-

Second, and remarkably, DOL relies (Br.31, 35) on a provision of the preamble that, it claims, "clarifies" that the Rule's fiduciary standard is not triggered by "merely making a 'sales pitch,' without meeting the Rule's requirements." But as that description reveals, this "clarification" is simply an illusion because (as explained) the Rule's requirements will always apply to a financial professional licensed to recommend an annuity or security. *Supra* pp.29-30. The "clarification" is a mere tautology, stating that the Rule does not apply where the Rule does not apply, without in any way reducing the Rule's application to sales recommendations. *See* 89 Fed. Reg. at 32,257.

It is also of no moment that the Rule applies to financial salespersons only after "persuad[ing] an investor to trust their advice," rather than "mere[ly] execut[ing] … an order to buy or sell an asset." Br.38. DOL made this same contention in 2016, 81 Fed. Reg. 20,946, 20,987-20,988 (Apr. 8, 2016), and it failed then for the same reason it fails now. Recommendations are a critical component of sales activity; they do not trigger fiduciary obligations at common law but do trigger such obligations under the Rule. Moreover, sales commissions

---

fiduciary sales relationships, *id.* at 380, and that "[t]ransforming sales pitches into the recommendations of a trusted adviser mixes apples and oranges," *id.* at 382 & n.15. This remains true. The question is whether insurance agents or brokers satisfy the test for common-law fiduciaries, not whether other state or federal laws impose enhanced consumer protections on their sales activity.

always require "persuad[ing]" a consumer to purchase a product. That the Rule

applies only to successful sales recommendations thus does nothing to bring it into

conformity with the common law.

Finally, DOL sets up and knocks down a strawman in arguing that the

district courts "contradict[ed] *Chamber*" by suggesting that "salespeople are

categorically exempt from classification as fiduciaries." Br.36. Appellees'

position is not that insurance agents or brokers are categorically exempt. The

problem for DOL is that, as this Court explained, "sales conduct … does not

usually create a [common-law] fiduciary relationship," 885 F.3d at 374; under the

Rule, however, it almost always creates a fiduciary relationship.

**2.** **The Rule unlawfully departs from ERISA's common-law standard by eliminating the longstanding "regular basis" and "primary basis" requirements**

The Rule is independently unlawful because, like the 2016 rule, it abandons

DOL's long-held understanding that a "fiduciary" is someone who renders advice

to the plan or client "on a regular basis" that "serve[s] as a primary basis for

investment decisions with respect to plan assets." 40 Fed. Reg. 50,842, 50,843

(Oct. 31, 1975). Since 1975, DOL has consistently considered these "regular

basis" and "primary basis" requirements to be "the hallmarks of an 'investment

advice' fiduciary's business." *Chamber*, 885 F.3d at 369. *Chamber* deemed their

elimination from the 2016 rule a "[c]ritical[]" problem because it meant the rule

"encompasse[d] virtually all financial and insurance professionals who do business with ERISA plans and IRA holders" and was in no way limited to those who meet the "'well-settled meaning' of 'fiduciary'" under the common law. *Id.* at 366, 371. The district court correctly held that the "'regular basis' and 'primary basis' requirements are essential to the meaning of 'fiduciary' in ERISA," and that, by removing them, the 2024 Rule here "makes the same mistake that led *Chamber* to set aside the 2016 Rule." ROA.24-10890.1484.

Start with the "regular basis" prong. As this Court recognized, "fiduciary responsibility … was founded on concepts of sanctity, trust, confidence, honesty, fidelity, and integrity" that typically must develop over time. *Chamber*, 885 F.3d at 370 (quoting 1 Turner, *Revocable Trusts* § 3:2 (Sept. 2016 update)). Because it involves "extraordinary reliance which causes [a consumer] to drop his guard, abandon formalities, and deal with another in intimacy," at common law, fiduciary responsibility generally presupposes a "preexisting confidential relation." Bogert, 13 Cornell L. Q. at 245-246; *see also Chamber*, 885 F.3d at 370-371 (citing Bogert's treatise and other treatises and common-law authorities). In keeping with that common-law understanding, "[t]he 'regular basis' factor ensure[s] that the fiduciary regularly advised [the] specific client—as would be expected in a relationship of trust and confidence." ROA.24-10890.1484-1485. And it is "ordinarily inconceivable that financial salespeople or insurance agents will have

an intimate relationship of trust and confidence with prospective purchasers" based on a one-time transaction, such as an IRA rollover. *Chamber*, 855 F.3d at 380. Thus, contrary to DOL's claim that the regular basis element has "no basis in the statutory text," 89 Fed. Reg. at 32,180, the element in fact ties the fiduciary standard to the common law.

Similarly, the 1975 test's "primary basis" prong reflects that there has been significant reliance on the fiduciary—the kind of "extraordinary reliance" necessary for fiduciary obligations to attach, Bogert, 13 Cornell L. Q. at 245. That degree of reliance is "again, consistent with a well-established relationship between an adviser and client built on trust and confidence." ROA.24-10890.1485.

Stripped of those two critical prongs, the Rule unlawfully sweeps in isolated interactions such as "one-time recommendations to roll over assets from a Title I plan to an IRA" where no specific investment advice about how to invest those plan assets even is offered. ROA.24-10890.1485-1486 (quoting *Chamber*, 885 F.3d at 366). This tears fiduciary status from its common-law roots and "captures transactions that do not satisfy the established 'relationship[s] of trust and confidence' contemplated by ERISA." ROA.24-10890-1486.

That the "regular basis" and "primary basis" requirements are the "hallmarks" of ERISA fiduciary status is confirmed by pre-*Chamber* precedent. For example, in *American Federation of Unions Local 102*, this Court considered a

plan's argument that an insurance company had violated a fiduciary duty by advising the plan to "reduce its costs by adopting a self-insured health benefits program." 841 F.2d at 661. This Court rejected that claim, holding that the company was not "a fiduciary" because its one-time advice to self-insure "was not given on a regular basis." *Id.* at 664. Similarly, in *Schloegel v. Boswell*, the defendant "did not render 'investment advice' for purposes of" ERISA because the record disclosed "only a few instances" of isolated advice, and because a number of plan trustees did not rely on or "follow[] [the defendant's] sales pitch" but instead sought advice from another consultant. 994 F.2d 266, 269, 273 (5th Cir. 1993). In these circumstances, there was no evidence of "a close relationship between [the defendant] and the … Plan." *Id.* at 269.

DOL argues that *Chamber* does not "require [DOL] to forever preserve the five-part test," Br.38, but whether or not that is true, *Chamber* certainly stands for the proposition that the "regular basis" and "primary basis" prongs are vital in ensuring that the fiduciary standard hews to the common law. Indeed, given the common-law authority discussed above, there are compelling reasons to conclude (contrary to DOL's arguments, Br.39) that "fiduciary" in ERISA has "a single, best meaning" that includes a "regular basis" and "primary basis" requirement. *Loper Bright*, 603 U.S. at 400. At the least, DOL's 1975 regulation, which includes those elements, is "entitled to 'great weight'" because it was "issued contemporaneously

with the statute at issue" and has "remained consistent." *Id.* at 388, 394. Whatever flexibility DOL may have to modify the 1975 test, it certainly cannot dispense with the same two elements that *Chamber* deemed to be "critical[]" when it vacated a materially identical rule seven years ago.

DOL also argues (Br.39) that the 1975 test "fails to capture many circumstances in which an investor would reasonably expect that they can place their trust and confidence in their advice provider." But, again, DOL conflates generic notions of trust with the special, intimate relationship required for fiduciary status. *Supra* p.33. In addition, as explained, DOL never meaningfully attempted to substantiate its factual assertions about investor expectations; the regulatory preamble, for example, cites only DOL's own "experience in the marketplace," Br.39 (quoting 89 Fed. Reg. at 32,132), whatever that means. Such conclusory, unexplained agency statements are entitled to no weight.

DOL's contentions that the "regular basis" and "primary basis" requirements render the 1975 test "underinclusive" fare no better. Br.39-40. As just explained, those longstanding requirements—individually and certainly in combination— helped to ensure that DOL's regulation "captured the essence of a fiduciary relationship known to the common law." *Chamber*, 885 F.3d at 365. In that light, DOL's assertion that eliminating those aspects of the 1975 test "more fully implements *Chamber*," Br.39, cannot be taken seriously. And DOL's apparent

policy view that the common law itself is "underinclusive" does not give DOL carte blanche to unmoor ERISA's fiduciary standard from the common law. That is the whole point of this Court's *Chamber* decision.

### 3. The Rule unlawfully departs from the common law by eliminating the "mutual agreement" requirement

The Rule also diverges from the common law and contravenes *Chamber* by imposing fiduciary duties absent a "mutual agreement to provide individualized advice," *Chamber*, 885 F.3d at 374, thus prohibiting parties from structuring their relationships as non-fiduciary through clear contractual language.

Consistent with the bedrock requirement of an intimate relationship involving extraordinary reliance, *see supra* p.40, clear and conspicuous acknowledgements that a fiduciary relationship did not exist were often credited at common law, even if not always dispositive. *E.g.*, *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 235 (Colo. 2018) (collecting cases). Courts have recognized, for example, that "[g]enerally, no fiduciary relationship exists where a contract unambiguously disclaims the possibility of a fiduciary relationship." *Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, 2017 WL 11103938, at *11 (S.D. Fla. June 26, 2017); *see also Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 808-809 (5th Cir. 2017) (enforcing "agreement [that] itself disclaims a fiduciary relationship"); *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1021-1022 (8th Cir. 2001) (where parties "expressly disclaimed

any [fiduciary or agency] relationship in their contract," that "precludes … claim for breach of fiduciary duties"). Indeed, where parties "exercised their rights to disclaim any fiduciary relationship," such a relationship typically did not exist "regardless of whether the underlying facts would have given rise" to one "in absence of such disclaimer." *Slamon v. Carrizo (Marcellus) LLC*, 654 F. Supp. 3d 405, 442 (M.D. Pa. 2023), *aff'd*, 2024 WL 4602673 (3d Cir. Oct. 29, 2024).

In jettisoning the "mutual agreement" prong of the 1975 test, the Rule deprives parties of the freedom to define the nature of their relationship—and replaces that freedom with a regulatory straitjacket. In issuing the Rule, DOL explained that a "written disclaimer is insufficient to defeat fiduciary status" whenever the elements of the Rule's fiduciary test are satisfied. 89 Fed. Reg. at 32,155. This means that a contractual agreement to avoid fiduciary obligations is effective only when the recommendation is not fiduciary (under DOL's test) to begin with. For example, the Rule does not permit an insurance agent to structure a relationship as non-fiduciary by saying: "I will make a recommendation that takes account of your needs, reflects my professional judgment, and complies with the state-law best interest standard. But to be clear upfront, we both understand and acknowledge that this will not be a fiduciary relationship."

The Rule's overreach is particularly apparent in DOL's refusal to exclude arm's length recommendations involving "communications with sophisticated and

independent parties." 89 Fed. Reg. at 32,160. It is implausible—indeed inconceivable—that such discussions between sophisticated parties would create an intimate relationship of trust and confidence at common law, especially when both parties disclaim that the relationship is fiduciary. *See, e.g.*, *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (sophisticated counterparties dealing "at [arm's] length" have no "fiduciary relationship" "absent extraordinary circumstances"); *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1038 (4th Cir. 1997) (brokerage firm had no "fiduciary duty" when parties "conducted their business at arm's length in a principal-to-principal relationship").

In the preamble, DOL attempted to justify its elimination of the "mutual agreement" requirement based on policy concerns about "fine print disclaimers." 89 Fed. Reg. at 32,179. But DOL made the same contention in 2016, 81 Fed. Reg. at 20,955, and it was insufficient to save that rule, for good reason. If fine print disclaimers are a problem, they can be addressed directly. The Rule, however, requires fiduciary obligations and deprives parties of the freedom to define their relationship even where their mutual agreement is clear and conspicuous. In that way, too, the Rule defies common-law fiduciary principles.

### 4. The Rule fails the major questions doctrine

The district court correctly held that the major questions doctrine puts to rest any doubts about the absence of DOL statutory authority. ROA.24-10890.1491-

- 46 -

1492; ROA.24-10890.1512.  Prior to the Supreme Court's express embrace of the doctrine, this Court reasoned that similar concerns applied because DOL claimed "unheralded power to regulate a significant portion of the American economy" by "reinterpret[ing]" a "long-extant statute."  *Chamber*, 885 F.3d at 387.  The Supreme Court has since made clear that courts must "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'"  *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).  To overcome the presumption, "something more than a merely plausible textual basis for the agency action is necessary"; an agency needs "'clear congressional authorization' for the power it claims."  *Id.*  DOL has nothing resembling clear authorization to assert powers of such "vast economic and political significance" as those implicated by the Rule.  *Louisiana v. Biden*, 55 F.4th 1017, 1033 (5th Cir. 2022)

DOL protests (Br.45-46) that the Rule does not reflect a major policy decision, but instead "simply implements *Chamber*'s construction of ERISA," accusing the district courts of "gloss[ing] over the Rule's limits and thus significantly overstat[ing] its scope."  But any claim that the Rule does not implicate a significant policy question is indefensible.  Among other things, the Rule upends a fifty-year-old regulatory framework, subjects wide swaths of the insurance and financial services industries to fiduciary regulation unknown to the common law, disregards the decisions of expert federal and state regulators not to

impose fiduciary obligations on such transactions, and results by DOL's own estimate in billions of dollars in costs. As the district court put it, the Rule "effect[s] a fundamental revision of the statute" that would "transform the trillion-dollar market for IRA investments, annuities, and insurance products." ROA24-10890.1492. "'It is not hard to spot regulatory abuse of power' in a case like this." ROA24-10890.1492.

For similar reasons, DOL is wrong (Br.46) that applying the major questions doctrine would mean that "any regulation connected to the retirement industry" or "any large industry" would trigger the doctrine. This Rule is not merely "connected" to a "large industry." Rather, it "transform[s]" the insurance and financial services industries by "regulating" them in a fundamentally "new way," intrudes on the jurisdiction of other regulators, and will spawn monumental consequences for "thousands of people and organizations working in th[e] [retirement] market," including insurance agents and broker-dealers, not to mention consumers who will be made worse off by the Rule. *Chamber*, 885 F.3d at 387.

### 5. Constitutional avoidance underscores the Rule's illegality

Finally, the canon of constitutional avoidance reinforces the Rule's unlawful sweep. Statutes should "be construed to avoid serious constitutional doubts," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009), but reading ERISA to

mandate fiduciary status for nearly all insurance agents and brokers in the retirement marketplace based on *speech*—oral or written recommendations to consumers—would raise serious constitutional concerns. The Rule imposes heavy regulatory burdens based on speech of particular content, namely, "recommendation[s]" to purchase retirement products, including those related to "rolling over, transferring, or distributing assets from a plan or IRA." 89 Fed. Reg. at 32,256-32,258. The Rule thus targets speech "propos[ing] a commercial transaction," *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)—the very definition of protected commercial speech—based on its content. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47-48 (2017). Such content-based regulations are "presumptively unconstitutional," and subject to strict scrutiny. *National Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018).

The Rule cannot withstand such scrutiny. DOL has not identified "an 'actual problem' in need of solving," and "the curtailment of free speech [is not] actually necessary to the solution." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799 (2011). DOL's assumption that consumers must be protected from truthful speech (*e.g.*, Br.32-33) cannot support content-based restrictions because "information is not in itself harmful," and "people will perceive their own best interests if only they are well enough informed." *Sorrell*, 564 U.S. at 578.

Moreover, several less restrictive alternatives, such as additional disclosure requirements, are available (to Congress, if not DOL) that could readily advance any legitimate regulatory aims. Instead of accepting "the broad reading" of fiduciary "advanced by [DOL]," the Court should interpret ERISA to "avoid" those "serious constitutional problems." *Mexican Gulf Fishing Co. v. Department of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023).

## B. The Rule Conflicts With *Chamber* In Other Ways

The Rule is contrary to law and clashes with *Chamber* for additional reasons: It erases the distinction between Title I and Title II fiduciaries; arrogates to DOL authority that Congress delegated to the SEC or reserved to the States; and, through the written acknowledgement requirement in PTEs 84-24 and 2020-02, enables private enforcement that ERISA does not authorize.

### 1. The Rule overrides the statutory distinction between Titles I and II of ERISA

As the district court reasoned, the Rule "conflicts with ERISA by ignoring the distinction between" Titles I and II. ROA.24-10890.1489. As explained (*supra* pp.14-15), Title I plan fiduciaries "must adhere to the traditional common law duties of loyalty and prudence" enforceable in lawsuits by DOL or private plaintiffs, while Title II IRA fiduciaries "are not saddled with these duties" and are instead subject only to an excise tax enforceable by the IRS. *Chamber*, 885 F.3d at 381. This difference "is taken to be intentional." *Id.*

The Rule impermissibly disregards this structural feature of ERISA. The Rule expands the definition of fiduciary (under both titles) so that ordinary sales recommendations are covered. Because fiduciary status triggers the prohibited transaction provisions' bar on compensation, the Rule then uses exemptions (PTEs 84-24 and 2020-02) to permit such compensation, but only if the new fiduciary complies with "Impartial Conduct Standards." As DOL acknowledges, those standards embody the very duties of prudence and loyalty Congress imposed on Title I but not Title II fiduciaries. *See* 89 Fed. Reg. at 32,137; *see* Br.5 ("Title II does not impose specific duties of loyalty and prudence"). *Chamber* rejected the 2016 rule's attempt to impose comparable standards on Title I and Title II fiduciaries through PTEs, reasoning that "treating IRA … providers in tandem with ERISA employer-sponsored plan fiduciaries … impermissibly conflate[d] the basic division drawn by" the statute. 885 F.3d at 381. The Rule here suffers from the same flaw.

DOL seeks to distinguish *Chamber* (Br.42), claiming this Court's analysis was driven by "what it saw as the 2016 rule's 'overbroad interpretation' of the term fiduciary." But the 2024 Rule is virtually indistinguishable in scope. *Supra* pp.36-37. In any event, the problem is that DOL "expanded the definition of investment advice fiduciary to capture IRA service providers, and then simultaneously imposed [Title I] fiduciary duties upon them as a condition of

receiving commissions." ROA.24-10890.1490. "This exceeds DOL's statutory authority." ROA.24-10890.1490.

### 2. The Rule usurps authority that the Dodd-Frank Act delegated to the SEC or reserved to the States

Like the 2016 regulation, the Rule also seizes authority that Congress delegated to the SEC or reserved to the States. As *Chamber* explained, the Dodd-Frank Act (1) delegated to the SEC the power to promulgate enhanced regulations of securities recommendations to retail customers (while prohibiting the SEC from eliminating commissions for broker-dealers); and (2) expressly reserved for States the authority to regulate fixed indexed annuities, when a State has adopted the NAIC's model regulation, as nearly all have. *Chamber*, 885 F.3d at 385. This Court held that the 2016 regulation "conflict[ed] with both of these efforts." *Id.* In particular, because the 2016 rule "both prohibited broker-dealers from receiving commissions (unless they qualified for a PTE) and regulated fixed indexed annuities," ROA.24-10890.1495, it impermissibly "occup[ied] the Dodd-Frank turf," *Chamber*, 885 F.3d at 386; *see* ROA.24-10890.1495.

The same is true here. The Rule applies to variable annuities that (as securities) are subject to the SEC's Reg BI, and to fixed indexed annuities that Dodd-Frank reserves for the NAIC's enhanced standards. 89 Fed. Reg. at 32,185. In that way, the Rule defies Congress's considered choices about who should regulate recommendations by brokers and insurance agents in connection with

retail securities and annuities transactions. As Judge Kernodle put it, because the Rule again "prohibits broker-dealers from receiving a commission and regulates all annuities," and "not just fixed indexed ones" in States without the NAIC's enhanced standards, it "seems likely that this argument will only bolster Plaintiffs' case on the merits." ROA.24-10890.1495.

DOL responds that Dodd-Frank allows for "overlapping Federal regulatory schemes" because it addressed only the SEC's authority under the federal securities laws and did not impair DOL's authority under ERISA. Br.44 n.6 (quoting 89 Fed. Reg. at 32,138). DOL made the same point in *Chamber*, but this Court was "unconvinced," because "Congress does not ordinarily specifically delegate power to one agency while knowing that another federal agency stands poised to assert the very same power." 885 F.3d at 386. Just so here.

### 3. The Rule's written acknowledgment requirement authorizes private enforcement that Congress did not

Finally, like the 2016 rule, the Rule impermissibly "create[s] vehicles for private lawsuits indirectly through … contract provisions" that are not authorized by Title II of ERISA. *Chamber*, 885 F.3d at 384. The 2016 rule did so through a "Best Interest Contract Exemption," which required covered fiduciaries to execute enforceable contracts with consumers to receive sales commissions. *Id.* at 366-367. This Court rejected that maneuver, holding that DOL had "assum[ed] … non-

existent authority to create private rights of action" in violation of the separation of powers. *Id.* at 384-385.

The Rule accomplishes the same end, by only slightly different means. Rather than label its requirement a "contract," the Rule relies on PTEs 84-24 and 2020-02 to require newly established IRA fiduciaries to provide a "written acknowledgement" pledging ERISA fiduciary status. 89 Fed. Reg. at 32,270, 32,331. The obvious (and presumably intended) effect of this "acknowledgement" is to expose salespeople to state-law liability under breach-of-fiduciary or breach-of-contract theories—"essentially recreating the 2016 Rule's private right of action." ROA 24-10890.1495. Indeed, the requirement serves no plausible purpose other than to create a judicial mechanism for private enforcement. The Rule is thus an unlawful "end run around Congress's refusal to authorize private rights of action enforcing Title II fiduciary duties." *Chamber*, 885 F.3d at 384.

DOL maintains that the acknowledgement does not require newly deemed fiduciaries to enter into contracts and does not create new "remedies," but "simply ensure[s] up-front clarity." Br.43 (quoting 89 Fed. Reg. at 32,311). But any "clarity" could be achieved by having salespersons disclose their non-fiduciary status. That the Rule requires them to pledge fiduciary status in writing makes clear that the purpose of the acknowledgment is to prevent brokers and insurance agents from disputing fiduciary status and expose them to liability under state

law—where additional remedies, beyond those provided by ERISA, may be available.

## II.   THE REMAINING STAY FACTORS WARRANT RELIEF

Judge O'Connor correctly held that the remaining stay factors warrant relief. ROA.24-10890.1495-1499; ROA.24-10890.1515-1519.  On appeal, as in the district court, "DOL does not even dispute … irreparable injury, and "[r]ightfully so."  ROA.24-10890.1516; Br.46.  Appellees submitted multiple, uncontested declarations showing significant compliance costs, and DOL itself acknowledged that "the Rule will cause more than half a billion dollars in compliance costs" in "the first year alone," followed by "$2.5 billion in costs … over the next decade." ROA.24-10890.1516; *see also* ROA.24-10890.164-215 (Appellees' declarations). These "more than de minimis" "compliance costs" and other injuries constitute irreparable harm under this Court's precedents.  *Restaurant Law Ctr. v. DOL*, 66 F.4th 593, 600 (5th Cir. 2023).

The remaining stay factors—balance of the equities and the public interest— merge when the government is the opposing party.  *Clarke v. CFTC*, 74 F.4th 627, 643 (5th Cir. 2023).  And Appellees' "strong showing of a likelihood of success is dispositive" of these factors, ROA.24-10890.1518, because "there is generally no public interest in the perpetuation of unlawful agency action," *Louisiana v. Biden*, 55 F.4th at 1035.  "To the contrary, there is a substantial public interest 'in having

- 55 -

governmental agencies abide by the federal laws that govern their existence and operations.'" *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022), *rev'd on other grounds*, 599 U.S. 670 (2023).

In addition, as the district court recognized, "numerous studies" show the "significant harm to low- and middle-income consumers" caused by DOL's 2016 rule, and "there is a strong public interest in limiting" the reoccurrence of that "substantial harm." ROA.24-10890.1518-1519; *see also* ROA.24-10890.219; ROA.24-10890.263-264; ROA.24-10890.290-291; ROA.24-10890.390-392; ROA.24-10890.414-419 (comments to DOL discussing harms caused by 2016 rule). In response, DOL cites (Br.47) "one commenter" in support of the Rule, ignoring the multiple studies in the record demonstrating consumer harm. DOL also asserts that the Rule "closes an 'important gap'" in consumer protection, *id.*, but any such interest surely cannot prevail when the Rule violates federal law. This consumer-protection rationale further ignores that, while the stay is in place, consumers will continue to be protected by existing, and recently enhanced, state and SEC regulations. Indeed, nearly all Americans now live in jurisdictions with enhanced protections for annuity sales. Moreover, DOL's claims of consumer harm from maintaining the stay ring hollow given the agency's choice not to try and pause the district courts' stay decisions or to expedite this appeal, and its subsequent requests to hold this appeal in abeyance for several months.

## III.  PROPER RELIEF IS NOT PARTY-LIMITED

Finally, DOL argues (Br.48-52) that any stay should be limited "to the plaintiffs in this case."  This argument is foreclosed by Circuit precedent: "Nothing in the text of Section 705 … suggests that … preliminary … relief under the APA needs to be limited to an [associational plaintiff] or its members."  *Career Colleges*, 98 F.4th at 255; ROA.24-10890.1499; ROA.24-10890.1521.  Instead, "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."  98 F.4th at 255.  As Judge O'Connor reasoned, moreover, party-specific relief is especially inappropriate here because the Rule imposes uniform requirements; limiting relief "'to the parties' … would 'prove unwieldy' and 'only cause more confusion.'"  ROA.24-10890.1521; *accord Feds for Med. Freedom v. Biden*, 63 F.4th 366, 388 (5th Cir. 2023), *vacated as moot*, 144 S. Ct. 480 (2023) (mem.).

General "equitable principles" do not change that analysis.  Br.48-49. *Career Colleges* rejected the same argument, concluding that "arguments that general and constitutional principles require the panel to limit any relief to the named parties do not hold water" in light of the APA's "specific statutory text," "longstanding administrative law principles," and the fact that the rulemaking there (as here) sought to "prescribe uniform federal standards."  98 F.4th at 255.  As

Justice Kavanaugh has persuasively explained, the government's arguments on this score are "novel and wrong." *Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 827 (2024) (Kavanaugh, J. concurring). Nor does *Braidwood Management, Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024), help DOL. *See* Br.50. To the contrary, this Court there reiterated that the APA's "default" relief is "not party-restricted," declining to order such relief only because no APA claim remained in the case. 104 F.4th at 951-953, *rev'd on other grounds*, *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748 (2025).

Finally, at a minimum, a stay must extend to Appellees' members. DOL does not argue otherwise, nor could it. DOL has never disputed that each Appellee is entitled to pursue relief on behalf of its members who are directly regulated by the Rule because (1) those members would have standing to sue in their own right; (2) the core interests Appellees seek to protect are germane to their organizational purposes; and (3) participation by individual members is not necessary given the purely legal questions at issue. ROA.24-10890.28-29; *Career Colleges*, 98 F.4th at 233-234. The stay must therefore protect Appellees' members.

## CONCLUSION

The Court should affirm the district court's order staying the Rule's effective date.

November 13, 2025

Respectfully submitted,

/s/ Kelly P. Dunbar

ANDRES C. SALINAS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

MICHAEL A. YANOF
NICOLAIDES FINK THORPE
  MICHAELIDES SULLIVAN LLP
2911 Turtle Creek Blvd., Suite 1025
Dallas, TX 75219
(469) 290-9047

DAVID W. OGDEN
KELLY P. DUNBAR
KEVIN M. LAMB
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 663-6000
kelly.dunbar@wilmerhale.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,930 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Kelly P. Dunbar
KELLY P. DUNBAR

# CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of November, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Kelly P. Dunbar
KELLY P. DUNBAR